# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | | |
|---|---|---|
| C. PAUL STANLEY, Administrator | ) | |
| of the Estates of William Edward Smith | ) | |
| Sr. and William Edward Smith Jr., | ) | |
|     Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No: 1:10cv00010 |
| | ) | |
| STAR TRANSPORT, INC., et al., | ) | |
|     Defendants | ) | **MEMORANDUM OPINION** |
| | ) | |
| | ) | By: PAMELA MEADE SARGENT |
| | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

This matter is before the undersigned on the Plaintiffs' Motion To Compel And For Appropriate Sanctions, (Docket Item No. 36), ("Plaintiffs' Motion to Compel"), and the Motion to Compel filed by defendant Star Transport, Inc., ("Star"), (Docket Item No. 46), ("Star's Motion to Compel"). The defendants have filed a brief in opposition to the Plaintiffs' Motion to Compel, (Docket Item No. 40), and the plaintiffs have filed a brief in opposition to Star's Motion to Compel, to which Star also has replied. (Docket Item No. 52; Docket Item No. 53). These motions are now ripe for disposition.

This case arises out of a motor vehicle accident resulting in the deaths of William Edward Smith Sr., ("Smith Sr."), and his son, William Edward Smith Jr., ("Smith Jr."), on February 5, 2010. At the time of the accident, defendant Ezzell Furgerson was operating an 18-wheel tractor trailer owned by defendant Star

northbound on Interstate 81. Also traveling northbound in a 2005 Dodge Grand Caravan, were the decedents, Smith Sr. and Smith Jr. While traveling in the left lane up an incline, Furgerson came upon a disabled vehicle blocking the left lane of northbound traffic. In an attempt to avoid colliding with this disabled vehicle, Furgerson swerved to the right, but hit a guardrail and the vehicle in which the Smiths were traveling,[1] which had stopped on the right shoulder area of northbound Interstate 81 in an effort to render aid to the occupants of the disabled vehicle. The Smiths were killed instantly upon impact.

On March 2, 2010, the plaintiffs sued the defendants, alleging, among other things, that Furgerson was liable for the wrongful deaths of the Smiths because he was operating his 18-wheel tractor trailer negligently, recklessly and/or wantonly in disregard for the rights and safety of others. On May 22, 2010, this court granted the defendants' Motion to Dismiss, dismissing without prejudice all claims against the defendants except the simple negligence claim. However, the court granted the plaintiffs leave to file an amended complaint, which they filed on June 7, 2010. In their Amended Complaint, plaintiffs asserted negligence and punitive damages claims against both defendants, while asserting negligent entrustment, negligent hiring and negligent retention claims against Star. On June 21, 2010, the defendants filed motions to dismiss the punitive damages claim, and Star filed a motion to dismiss the negligent hiring claim. These motions remain pending at this time.

In furtherance of their wrongful death action, the plaintiffs issued interrogatories to Furgerson, to which Furgerson, through counsel, provided

---

[1]According to the official police report, at the time of the collision, the Smiths had exited their vehicle and were standing on the right shoulder of the interstate.

unexecuted answers on May 7, 2010. In a cover letter addressed to plaintiffs' counsel attached to these May 7, 2010, answers, counsel for Furgerson stated that he would "forward [his] clients' executed signature pages to you in the very near future." Plaintiffs deposed Furgerson on June 2, 2010, in Peoria, Illinois. At that time, Furgerson, through counsel, refused to execute the May 7, 2010, answers, and he invoked his Fifth Amendment privilege against self-incrimination to several questions posed during the deposition. Furgerson contends that the week prior to this deposition, he became aware that the Commonwealth's Attorney for Wythe County, the area where the fatal collision occurred, was possibly conducting an ongoing criminal investigation into the accident and, more specifically, into Furgerson's actions at the time the collision occurred. As a result, Furgerson's counsel contacted a local criminal defense attorney to determine the status of the Commonwealth's Attorney's investigation and to secure representation related to any possible criminal charges against Furgerson. On the evening prior to Furgerson's deposition, this criminal defense attorney informed Furgerson, through counsel, that the Assistant Commonwealth's Attorney for Wythe County had confirmed that he was investigating the accident and was contemplating criminal charges against Furgerson that could include involuntary manslaughter. The criminal defense attorney advised Furgerson, by counsel, to invoke his Fifth Amendment privilege in his deposition the following day. Based on this advice, Furgerson invoked his Fifth Amendment privilege against self-incrimination to certain deposition questions posed by plaintiffs' counsel. Following this deposition, Furgerson learned that the Assistant Commonwealth's Attorney intends to convene a grand jury in October to consider criminal charges against him stemming from the February 5, 2010, accident.

On June 28, 2010, after learning of the active criminal investigation into the

accident, Furgerson executed Amended Answers To The Plaintiffs' First Interrogatories, in which he invoked his Fifth Amendment right against self-incrimination in response to certain interrogatories posed by the plaintiffs.

In the Plaintiffs' Motion to Compel, the plaintiffs request the court to compel Furgerson to execute the answers to the May 7, 2010, interrogatories and to provide substantive answers to the areas of questioning posed to him at his deposition to which he asserted the Fifth Amendment privilege against self-incrimination. Plaintiffs also request that, due to Furgerson's alleged improper and unjustifiable basis for his refusal to participate in discovery, this court sanction the defendants for the cost of preparing the Plaintiffs' Motion to Compel, the cost of reconvening Furgerson's deposition and to require Furgerson to appear in the Western District of Virginia for such reconvened deposition.

## II. Analysis

### A. Plaintiffs' Motion to Compel

The plaintiffs first argue that Furgerson should be compelled to execute the May 7, 2010, interrogatory answers. I find this argument unpersuasive. The plaintiffs are correct in their assertion that Federal Rule of Civil Procedure 33(b)(5) requires the party answering interrogatories to sign them. It is not disputed that Furgerson did not sign the May 7, 2010, interrogatories. The parties do not disagree that defense counsel informed plaintiffs' counsel that executed responses would be provided at Furgerson's deposition. However, as stated above, just prior to the time of Furgerson's deposition, Furgerson learned of the existence of an active criminal investigation into his conduct,

-4-

and he was advised by counsel to assert his Fifth Amendment right against self-incrimination, which he did. This is precisely why the May 7, 2010, answers to interrogatories were never executed, and why Furgerson chose to submit amended answers to the same interrogatories on June 28, 2010, which were signed. Thus, contrary to the plaintiffs' allegation, Furgerson has complied with Rule 33(b)(5), in that he has signed the June 28, 2010, answers – the answers he wishes to provide. It is true that in these amended answers, Furgerson changed some of his answers from the May 7, 2010, interrogatory answers, and he asserted his Fifth Amendment right to many of the interrogatories. However, the court simply cannot compel Furgerson to execute the May 7, 2010, answers to interrogatories. The defendant is correct in noting that the proper course of action by the court for failure to sign interrogatories is to strike the answers. *See* FED. R. CIV. P. 26(g)(2) (stating that the court must strike an unsigned disclosure, request, response or objection unless a signature is promptly supplied after the omission is called to the attorney's or party's attention). Thus, I find that the appropriate course of action for the court to take is to simply strike these answers as contemplated by Rule 26.

Next, plaintiffs' counsel relies on *Saria v. Mass. Mut. Life Ins. Co.*, 228 F.R.D. 536, 538-39 (S.D. W. Va. 2005), in support of his argument that Furgerson's failure to sign the May 7, 2010, answers to interrogatories constitutes a flagrant disregard of the Federal Rules of Civil Procedure and must be sanctioned appropriately. However, I note that *Saria* stands only for the proposition that Rule 33(b)(5), requiring signature by the person making answers to interrogatories, requires strict compliance. As discussed above, Furgerson has met this obligation by signing and providing the June 28, 2010, amended answers to interrogatories. That being the case, I find that the plaintiffs' reliance on *Saria* is misplaced. For all of these reasons, I will strike

Furgerson's May 7, 2010, answers to interrogatories, and I find that sanctions are not appropriate based on Furgerson's failure to provide a signed copy of these discovery responses.

Next, the plaintiffs ask the court to reconvene Furgerson's deposition in the Western District of Virginia and compel him to answer deposition questions to which he asserted his Fifth Amendment privilege. Specifically, the plaintiffs contend that Furgerson has waived his Fifth Amendment privilege and, even if the court were to find that no such waiver occurred, he improperly asserted the privilege to questions that would not expose him to any criminal liability. I will address these arguments in turn.

### 1. *Waiver of Fifth Amendment Privilege*

The Fifth Amendment, made applicable to the states by the Fourteenth Amendment, *see Malloy v. Hogan*, 378 U.S. 1, 6 (1964), commands that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." It is well-settled that the Fifth Amendment privilege against self-incrimination applies in any type of proceeding, whether it be civil, criminal, administrative, investigatory or adjudicatory. *See United States v. Sharp*, 920 F.2d 1167, 1170 (4th Cir. 1990) (citing *Maness v. Meyers*, 419 U.S. 449, 464 (1975)). Rather than basing the availability of the privilege on the type of proceeding in which it is involved, we must base it on "the nature of the statement or admission and the exposure which it invites." *Application of Gault*, 387 U.S. 1, 49 (1967). Moreover, the Fifth Amendment's protection applies "not only to evidence which may directly support a criminal conviction, but to 'information which would furnish a link in the chain of evidence that could lead to

prosecution, as well as evidence which an individual reasonably believes could be used against him in a criminal prosecution.'" *Sharp*, 920 F.2d at 1170 (quoting *Maness*, 419 U.S. at 461).

Fifth Amendment protection may be waived by certain actions. In *Mitchell v. United States*, 526 U.S. 314, 321 (1999) (quoting *Brown v. United States*, 356 U.S. 148, 154-55 (1958)), the United States Supreme Court stated as follows:

> It is well established that a witness, in a single proceeding, may not testify voluntarily about a subject and then invoke the privilege against self-incrimination when questioned about the details.... The privilege is waived for the matters to which the witness testifies, and the scope of the "waiver is determined by the scope of relevant cross-examination."

In *Envtl. Def. Fund, Inc. v. Lamphier*, 714 F.2d 331, 339 (4th Cir. 1983), the Fourth Circuit Court of Appeals stated that "[w]here *incriminating* facts have been voluntarily revealed, the fifth amendment privilege may not then be invoked to avoid disclosure of the details." (emphasis added) (citing *Rogers v. United States*, 340 U.S. 367, 373 (1951), and *In re Folding Carton Antitrust Litigation*, 609 F.2d 867, 873 (7th Cir. 1979)). In *McCarthy v. Arndstein*, 262 U.S. 355, 359 (1923), the Supreme Court stated " . . . where the previous disclosure by an ordinary witness is not an actual admission of guilt or incriminating facts, he is not deprived of the privilege of stopping short in his testimony whenever it may fairly tend to incriminate him." In *Rogers*, 340 U.S. at 371, the Supreme Court explained that to permit a claim of the privilege on questions asked on proper cross-examination "would open the way to distortion of facts by permitting a witness to select any stopping place in the testimony."

-7-

In contending that Furgerson waived his Fifth Amendment privilege, the plaintiffs rely on *Mitchell*, 526 U.S. at 321 and *Lamphier*, 714 F.2d at 339. The plaintiffs argue that in neither Furgerson's May 7, 2010, answers to interrogatories or to the corresponding requests for admission did he raise the Fifth Amendment privilege. Instead, the plaintiffs assert that in Furgerson's May 7, 2010, answers to interrogatories, he answered the questions that go to the heart of the claims of this matter. The plaintiffs contend that because Furgerson provided answers to these interrogatories and corresponding requests for admission, he could not thereafter, at his deposition, invoke the Fifth Amendment's protection in response to questions relating to those areas to which he already had provided written answers. I first note that the plaintiffs are attempting to hold Furgerson to the answers contained in the *unexecuted* May 7, 2010, answers to interrogatories. However, because these answers to interrogatories were never executed, and because this court has struck those answers, the plaintiffs cannot hold Furgerson to these answers in arguing that he has waived his Fifth Amendment privilege. I further note that Furgerson invoked his Fifth Amendment privilege in the executed June 28, 2010, amended answers to interrogatories. It is these answers that now control. Thus, for these reasons, I find the plaintiffs' argument that Furgerson waived his Fifth Amendment privilege by providing answers to the May 7, 2010, interrogatories and requests for admission unpersuasive.

Next, the plaintiffs argue that, at his deposition, Furgerson testified as to the cause of the accident at issue and, therefore, he waived his Fifth Amendment privilege with regard thereto. Specifically, the following exchange took place between plaintiffs' counsel and Furgerson:

-8-

Q:      Now I don't want you to answer this question right now but as –
as we ask these questions today and we go through this deposition
I just want you to think about this question and, again, I don't
want you to answer it.  I just want you to think about whether or
not you accept any responsibility for the death of William Smith,
Sr., or William Smith, Jr.  Okay?

A.      I do, you know –

(Exhibit 2 to Plaintiffs' Motion to Compel, ("Ex. 2"), at 7-8).  It was at this point that

Furgerson's counsel objected and advised him to invoke the Fifth Amendment.  (Ex.

2 at 8).  Plaintiffs' counsel, at that point, again said ". . . You don't have to answer that

right now."  (Ex. 2 at 8.)  Plaintiffs contend that defense counsel did not inform them

at the beginning of the deposition that the Fifth Amendment was going to be an issue.

They argue that for defense counsel to object after the question was asked and

answered was untimely and, therefore, the privilege was waived.  I disagree.  First,

plaintiffs' counsel, in making this statement, specified twice that he did not want

Furgerson to provide an answer.  He merely wanted him to think about whether he

accepted any responsibility for the deaths of the decedents.  Moreover, Furgerson's

"answer" was cut short so it may only be speculated as to what he was going to say.

There is no way to know that, as the plaintiffs apparently believe, he was going to

unqualifiedly state "I do, you know, completely accept responsibility for their deaths."

In any event, defense counsel's objection cannot be deemed untimely because the

manner in which plaintiffs' counsel phrased the "question" was not seeking any

answer from Furgerson.  Therefore, defense counsel did not know that Furgerson

would attempt to answer, but when he began to do so, counsel immediately objected

and advised Furgerson to invoke his Fifth Amendment rights.  For all of these reasons,

I find unpersuasive the plaintiffs' argument that Furgerson waived his Fifth

Amendment rights on these grounds.  Plaintiffs argue that, in any event, given

Furgerson's answers to the May 7, 2010, interrogatories, he already had testified as to the cause of the accident and he, therefore, could not assert the Fifth Amendment privilege at his deposition with regard thereto. As already discussed above, however, these answers never were executed, and the court will strike those answers. For this reason, I find this argument unpersuasive as well.

Next, the plaintiffs argue that because Furgerson voluntarily testified regarding the Federal Motor Carrier Safety Regulations, ("FMCSRs"), his previous log book violations and the defensive driving training he received at Star, he could not, thereafter, invoke the Fifth Amendment privilege to additional questioning related to those topics. However, for the reasons stated below, I find this argument unpersuasive as well. In support of this argument, the plaintiffs again rely on *Mitchell* and *Lamphier*. In *Mitchell*, the Supreme Court stated as follows: "a witness, in a single proceeding, may not testify voluntarily about a subject and then invoke the privilege against self-incrimination when questioned about the details." 526 U.S. at 321 (citing *Rogers*, 340 U.S. at 373). As noted above, the Fourth Circuit went a step further in *Lamphier* by stating that "[w]here *incriminating* facts have been voluntarily revealed, the fifth amendment privilege may not then be invoked to avoid disclosure of the details." 714 F.2d at 339 (emphasis added) (citing *Rogers*, 340 U.S. at 373 and *In re Folding Carton Antitrust Litigation*, 609 F.2d at 873). Therefore, reading *Mitchell* and *Lamphier* together, it appears that when the subject testimony would pose a real and substantial danger of further incrimination beyond the testimony already given, there is no duty to disclose the further testimony. However, the Fifth Amendment privilege against self-incrimination may not be invoked on no more than the mere assertion by one claiming the privilege that information sought by the government may be incriminating. *See Sharp*, 920 F.2d at 1170. "Whether there is a sufficient

hazard of incrimination is . . . a question for the courts asked to enforce the privilege." *Sharp*, 920 F.2d at 1170 (citing *Hoffman v. United States*, 341 U.S. 479, 486 (1951)).

In *Hoffman*, the Court explained that "[t]o sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." 341 U.S. at 486-87. In making this determination, a court asks two things: (1) whether the information is incriminating in nature; and (2) whether criminal prosecution is sufficiently a possibility. *See Sharp*, 920 F.2d at 1170-71. Finding that the information sought is incriminating in nature may appear in either of two ways. It may be evident on its face, in light of the question asked and the circumstances of its asking. *See Sharp*, 920 F.2d at 1170 (citing *Hoffman*, 341 U.S. at 486-87). If so, the inquiry ends. If not, the person asserting the privilege may demonstrate its incriminating potential by further contextual proof. *See Sharp*, 920 F.2d at 1170 (citing *United States v. Rylander*, 460 U.S. 752, 758-59 (1983)). If the incriminating nature of the information is established, then the court must determine whether criminal prosecution is sufficiently a possibility. In order to do this, the court must assess the objective reasonableness of the target's claimed apprehension of prosecution. *See Sharp*, 920 F.2d at 1171. Furthermore, the reasonableness of a claimed apprehension should simply be assumed once incriminating potential is found, unless there are genuine questions about the government's ability to prosecute. *See Sharp*, 920 F.2d at 1171. In other words, once incriminating potential is found to exist, courts should not engage in raw speculation as to whether the government will actually prosecute, *see United States v. Edgerton*, 734 F.2d 913, 921 (2d Cir. 1984) (quoting *United States v. Jones*, 703 F.2d 473, 478 (10th Cir. 1983)), and should only pursue that inquiry when there are real questions

-11-

concerning the government's ability to do so because of legal constraints such as statutes of limitation, double jeopardy or immunity. *See Sharp*, 920 F.2d at 1171 (citing *In re Folding Carton Antitrust Litigation*, 609 F.2d at 872).

Here, while Furgerson testified that he was aware of the FMCSRs, that he learned about them during three orientation programs at Star and that he refreshed himself on updates to them, he invoked his Fifth Amendment privilege as to questions that insinuated that he was not as up to date on the regulations as he should have been or that he was likely to ignore these regulations because he believed them to be unnecessary. (Ex. 2 at 57-81.) More specifically, Furgerson testified that he had completed three orientation programs at Star, from August 2003 through September or October 2004, during which safety training was provided. (Ex. 2 at 70-71, 80.) He stated that his most recent refresher course was in approximately March 2009, in preparation for a hazardous materials endorsement. (Ex. 2 at 81.) Furgerson testified that he kept a pocket book of the FMCSRs in his truck at all times. (Ex. 2 at 79-80.) He further testified that Star had given him a driver safety manual and handbook which included rules and regulations according to the company that included, among other things, safety procedures. (Ex. 2 at 86.) Furgerson also testified that he passed a test on these rules and regulations. (Ex. 2 at 86.)

It is due to this testimony regarding the FMCSRs that plaintiffs' counsel contends that Furgerson has waived his right to assert his Fifth Amendment privilege as to further questioning relating to the FMCSRs. The questions relating to the FMCSRs to which Furgerson asserted his Fifth Amendment privilege were as follows: (1) at what time prior to March 2009 did he last review those regulations; (2) whether he thought the FMCSRs were necessary; and (3) how many hours were spent in Star's

-12-

orientation programs on the FMCSRs. The questions to which Furgerson invoked his Fifth Amendment privilege with regard to the FMSCRs appear to have been an attempt to elicit testimony from him that he violated them, either because he was not as up to date on them as he should have been, he was not trained properly with regard to them or because he felt that these regulations were unnecessary. It is evident from the implications of these questions, in the setting in which they were asked – more specifically, a deposition in a civil case the subject matter of which is the same subject matter giving rise to an active criminal investigation as to the witness's conduct – that a responsive answer to them or an explanation of why they cannot be answered could be dangerous because injurious disclosure could result to Furgerson. Thus, I find that Furgerson did not waive his Fifth Amendment privilege to this area of questioning.

The same can be said of the questions regarding Furgerson's log book violations. In particular, Furgerson testified that Star would eventually suspend and/or terminate a driver if enough log book violations occurred and that most of his violations occurred "early on," between 2003 and 2006. (Ex. 2 at 105, 112-13.) However, Furgerson invoked the Fifth Amendment when asked how many log book violations, for a driver of his experience, would be considered excessive. Again, I find that Furgerson did not waive his Fifth Amendment privilege to this entire area of questioning by way of his testimony on this subject. More specifically, I find that the questions he answered were not incriminating to him, in that they were merely regarding what he believed Star's reaction would be to a driver with excessive log book violations and his testimony that he had some log book violations "early on." However, the question regarding whether he believed his log book violations were excessive, given his experience as a truck driver, could be incriminating by allowing an inference that he, personally, was a negligent or reckless driver. Thus, I find that

-13-

Furgerson did not waive his Fifth Amendment privilege to this area of questioning.

The plaintiffs next argue that Furgerson waived his Fifth Amendment privilege by giving testimony related to his defensive driving training. In particular, Furgerson testified that he believed defensive driving meant keeping up one's guard to perceive hazards or potential hazards and knowing the corrective action to avoid that hazard in order to avoid an accident. (Ex. 2 at 99-100.) He further testified that he had taken a defensive driving class before being employed by Star and that he had undergone defensive driving training with his trainer at Star. (Ex. 2 at 100-01.) However, when asked whether he believed additional defensive driving training would have been helpful in avoiding the accident at issue, Furgerson invoked the Fifth Amendment. (Ex. 2 at 101-02.) He also invoked the Fifth Amendment to the following questions, among others, related to defensive driving: (1) what speed he was traveling before applying his brakes just prior to the collision; (2) how long it would take to stop a 17,000 pound tractor trailer on both dry pavement and on wet pavement at a speed of 60 miles per hour; (3) whether anything he did or did not do contributed to the collision; (4) whether he would agree that speed should be reduced in conditions such as rain, snow, ice, sleet, etc. in case the need to suddenly stop or slow down arose; (5) what his responsibility would be if driving around a curve where he could not see too far ahead; (6) whether, as a professional truck driver, he has to anticipate coming up on an accident scene in inclement weather; (7) whether, as a professional truck driver, he has a duty to manage the space between his vehicle and others in front of him; (8) whether defensive driving must be a natural part of a professional truck driver's life to be able to detect accident-producing situations and to avoid them daily; (9) whether he realized the importance of reducing his speed by at least one-third of the posted speed limit in inclement weather due to reduced visibility, which affects reaction time;

-14-

and (10) whether he would agree that by slowing down a little, one can greatly decrease braking distance.

Again, I find that providing answers to the questions to which Furgerson invoked the Fifth Amendment could result in incriminating evidence against him. As stated earlier, Furgerson is the subject of an ongoing criminal investigation that could result in him being charged with involuntary manslaughter stemming from his conduct surrounding the February 5, 2010, accident. Providing answers to such questions as enumerated above could result in incriminating evidence against Furgerson, in that the inference could be drawn that Furgerson operated his truck in a negligent or reckless manner and was so operating it at the time of the collision. For these reasons, I find that Furgerson did not waive his Fifth Amendment privilege as it relates to questioning pertaining to defensive driving training.

Lastly, the plaintiffs argue that Furgerson waived his Fifth Amendment privilege as to the events of the days leading up to the accident, as well as the day of the accident itself. The plaintiffs base this argument entirely on Furgerson's May 7, 2010, answers to interrogatories. However, I already have struck these answers. Therefore, I find the plaintiffs' argument unpersuasive.

## 2. *Improper Invocation of the Fifth Amendment*

The plaintiffs also argue in their Motion to Compel that Furgerson improperly, and in bad faith, invoked his Fifth Amendment privilege to questions that would not have subjected him to criminal liability. Again, for the most part, I disagree. The plaintiffs specify the following areas of questioning to which they argue that

Furgerson so improperly invoked his Fifth Amendment privilege: (1) his sleep habits; (2) capabilities of GPS devices; (3) whether his truck had a speed governor; (4) capabilities of the Eaton Vorad collision avoidance system installed on his truck; (5) why he could not answer a question without invoking the Fifth Amendment; (6) whether he would help in the discovery process; and (7) whether he would help the plaintiffs get closure. The plaintiffs further describe as "bewildering" Furgerson's invocation of the Fifth Amendment as to whether a particular photograph looked like the inside of his truck and whether if certain documents reflected that his truck was out of service from January 29, 2010, through February 4, 2010, he would disagree.

First, questions pertaining to Furgerson's sleep habits likely could be incriminating under the circumstances. Specifically, Furgerson was asked whether he considered himself to be a deep sleeper or whether he tended to wake up easily at night. (Ex. 2 at 85.) While this question might appear to be innocuous at first glance, in the context in which it was asked, it certainly could be incriminating. For instance, as the defendants point out in their opposition brief, (Docket Item No. 40), questions related to Furgerson's sleep habits, including whether he was a "deep sleeper," appear to be aimed at eliciting testimony that he was fatigued at the time of the collision, a fact that could bear directly on his potential criminal liability. Moreover, questions regarding the existence of a speed governor on Furgerson's truck obviously go to his speed at the time of the collision – another fact that could bear directly on his potential criminal liability. Next, in response to questioning as to whether a particular photograph looked like the inside of his truck, I find that Furgerson properly invoked his Fifth Amendment privilege based on defense counsel's contention that this photograph depicted the Eaton Vorad collision avoidance system that the plaintiffs argue was not working at the time of the collision. In their Complaint, plaintiffs allege

-16-

that Furgerson knowingly operated his tractor trailer without a functioning Vorad warning system and, as a result, he acted negligently, recklessly, willfully and wantonly, the very same accusations that the Commonwealth of Virginia is currently investigating to determine whether Furgerson acted with criminal negligence. All of this being said, I find that Furgerson properly invoked his Fifth Amendment privilege in this context and under these circumstances.

Next, the plaintiffs argue that Furgerson improperly invoked the Fifth Amendment when asked when his vehicle was under repair prior to the accident. The deposition transcript reveals that Furgerson testified that his truck had been out of service prior to February 5, 2010. (Ex. 2 at 135.) He further testified that it was out of service "[p]robably to the 4th of February. Just, say, go back three or four days." (Ex. 2 at 135.) When asked whether he would have any reason to disagree with documents reflecting that it was out of service from January 29, 2010, until February 4, 2010, he stated "[t]hat's about the time frame that it was out of service." (Ex. 2 at 135-36.) When asked to clarify that it had been out of service for approximately seven days, it appears that Furgerson attempted to answer that particular question by thinking out loud to try to backtrack through the events of that time, but his attorney advised him to invoke his Fifth Amendment rights, which he did, explaining that he was doing so because he could not definitively answer that particular question. I find that invocation of the Fifth Amendment is not proper to avoid answering a question based merely on an inability to definitively provide an answer. Furgerson should have simply stated that he could not provide a definitive answer to that question and stopped there. I further find, however, that if Furgerson knew the answer to that question, his Fifth Amendment privilege would have been waived on this issue given his previous testimony. However, that is not the case and, because Furgerson cannot

-17-

provide a definitive answer, the court cannot now compel him to do so. However, I note that the plaintiffs are not left without any testimony from Furgerson on this subject, and it is clear that they have documentation to support their contention as to when Furgerson's truck was under repair. With regard to the questions pertaining to whether Furgerson's truck was equipped with GPS devices or other equipment that could be "helpful to drivers," the clear implication is that he was negligent if he did not have such equipment or, if he did, he must either have negligently ignored it or it was not working properly. In either case, the answer to such question clearly is potentially incriminating for Furgerson given the ongoing criminal investigation into his conduct that could result in a charge of involuntary manslaughter. Thus, I find that Furgerson's invocation of the Fifth Amendment to this line of questioning was proper.

Lastly, the plaintiffs argue that Furgerson improperly invoked the Fifth Amendment to questions as to why he invoked the Fifth Amendment in response to the questions that he did and whether he wished to provide closure to the plaintiffs. I disagree. It is well-settled that "if the witness, upon interposing his claim, were required to prove the hazard . . . he would be compelled to surrender the very protection which the privilege is designed to guarantee. To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." *Malloy*, 378 U.S. at 11-12 (quoting *Hoffman*, 341 U.S. at 486-87.) For the reasons already discussed herein, it is evident from the implications of the questions to which Furgerson invoked the Fifth Amendment, that responsive answers thereto or an explanation of why they could not be answered could result in injurious disclosure. Any question as to whether he wished to provide the plaintiffs closure can be viewed

-18-

only, as the defendants allege, as an attempt to "guilt" Furgerson into waiving his Fifth Amendment rights. It is for these reasons that I find that Furgerson did not improperly invoke the Fifth Amendment to this line of questioning.

Given all of the above findings, I will deny the plaintiffs' motion insofar as it seeks sanctions and insofar as it asks the court to reconvene Furgerson's deposition.

While the court has, in large part, upheld Furgerson's right against self-incrimination, Furgerson is advised that his Fifth Amendment privilege may have adverse consequences in this civil matter. For instance, the trier of fact may draw adverse implications from the invocation of the privilege and Furgerson may be barred from introducing any evidence on any issue on which he asserted the privilege. *See In re Heraud*, 410 B.R. 569, 575-76 (E.D. Mich. 2009).

*B. Defendant Star's Motion to Compel*

In its Motion to Compel, Star seeks "full and complete answers" to the following: (1) Interrogatory No. 4; (2) Request for Production No. 1; (3) Interrogatory No. 10; (4) Interrogatory No. 18; and (5) Request for Production No. 4. Star further asks the court to compel the plaintiffs to have the appropriate individual execute a standard release for Smith Sr.'s military health records.

*1. Interrogatory No. 4 and Release for Military Records*

Interrogatory No. 4 states as follows:

-19-

> Identify all healthcare providers who examined, treated or otherwise provided medical care for each of the decedents during the five years preceding the subject accident, and specify the dates and reason for each treatment, consultation and examination. Please indicate whether you will agree to execute medical releases permitting the Defendant to obtain the decedents' records from each such provider.

The plaintiffs objected to the interrogatory as irrelevant, overly broad, unduly burdensome and not likely to lead to the discovery of admissible evidence under Rule 26. The plaintiffs argue that the health of the decedents is not at issue in this wrongful death action, noting that Star has admitted that both decedents were instantly killed upon impact and received no medical treatment. Additionally, the plaintiffs note that they stated in their response to Interrogatory No. 1 that they are making no claim for loss of income under Va. Code Ann. § 8.01-52(2)(i).[2] Therefore, they contend that the request for medical records of either decedent is irrelevant to the underlying wrongful death action and the remaining damages sought. The plaintiffs argue that based upon the damages sought, there is no legal basis that would permit Star to introduce evidence of either decedent's health condition at the time of death and that Star fails to provide the court with any case law in support of this position. To the contrary, Star argues that the plaintiffs' assertion that the decedents' health at the time of the collision is not relevant to their wrongful death claims is without merit and has been explicitly rejected by the Virginia Supreme Court in *Graddy v. Hatchett*, 353 S.E.2d 741 (Va. 1987). In *Graddy*, the court held that "the expectancy of continued life of the decedent is relevant and necessary to establish the extent of loss" of society, companionship, comfort, guidance, advice, services, protection, care and assistance provided by the decedent. 353 S.E.2d at 744-45.

---

[2] Va. Code Ann. § 8.01-52(2)(i) provides recovery for loss of income of a decedent. Therefore, the health of a decedent may be relevant to a claim for loss of income to the extent that the ability to maintain gainful employment is concerned.

-20-

I find that the health of the decedents is relevant to the instant matter for precisely the reason stated by Star. It is true that the plaintiffs are not seeking damages for lost income under Va. Code Ann. § 8.01-52(2). However, Va. Code Ann. § 8.01-52(1) states as follows: "The verdict or judgment of the court trying the case without a jury shall include, but may not be limited to damages for the following . . . [s]orrow, mental anguish, and solace which may include society, companionship, comfort, guidance, kindly offices and advice of the decedent." As the Virginia Supreme Court in *Graddy* noted, the expectancy of the continued life of the decedent is relevant and necessary to establish the extent of loss to the decedent's beneficiaries of society, companionship, comfort, guidance, advice, services, protection, care and assistance provided by the decedent. *See* 353 S.E.2d at 744-45. The *Graddy* court further held that such damages are appropriate upon a showing that such items of loss are supported by the evidence. *See* 353 S.E.2d at 745.

Here, there is evidence in the record that the decedents' beneficiaries include the following individuals: (1) Brandy G. Spradling: half sister of Smith Jr. and daughter of Smith Sr.; (2) Andrew Smith: son of Smith Sr. and brother of Smith Jr.; (3) Joseph Smith: son of Smith Sr. and brother of Smith Jr.; (4) Thomas Wearen: half brother of Smith Jr.; (5) Elijah Ellis: half brother of Smith Jr.; (6) Roxanne Smith: surviving spouse of Smith Sr.; and (7) Donna Henderson: surviving mother of Smith Jr. Just as in *Graddy*, there is evidence in the record before this court to show the quality of the relationships between the decedents and their beneficiaries. For instance, in their First Supplemental Responses To Star Transport Inc.'s First Interrogatories, (Exhibit D to Docket Item No. 47), the plaintiffs state that Smith Sr. provided love, intimacy, comfort, support, emotional protection, physical protection, understanding and emotional availability that only a devoted husband of 14 years could provide to

-21-

his widow, Roxanne Smith. They further state that Smith Sr. provided help with household chores and regularly participated in repairs needed to their residence. The plaintiffs state that Smith Sr. provided fatherly guidance to his children, Brandy Spradling, Joseph Smith and Andrew Smith and was always available to each of them. They state that he maintained an emotional connection with his children as only a loving and devoted father could. Relating to Smith Jr., the plaintiffs state that he provided his mother, Donna Henderson, with the love and affection that only a son can provide. They state that he was best friends with his two "full brothers," Joseph Smith and Andrew Smith, and that he shared a special bond with each of them that only brothers can share. In fact, the plaintiffs state that they did everything together and were, if possible, closer than brothers. The plaintiffs state that, at the time of his death, Smith Jr. lived with his half-sister, Brandy Spradling, and that he provided her with protection, love and support. They concede that Smith Jr. was unable to develop much of a relationship with either Thomas Wearen or Elijah Ellis, his half brothers, because both were significantly younger than him. They state that while Wearen knew Smith Jr. to be his half brother, they rarely spoke, and Ellis was too young at the time of Smith Jr.'s death to understand that Smith Jr. was his half brother. Given this information, I find that there is sufficient evidence in the record to support that society, companionship, comfort, guidance, kindly offices and advice of the decedents were lost due to the decedents' deaths.

All of this being said, I find that the health of the decedents for the five years preceding their deaths is relevant and necessary to determine the appropriate measure of damages for such loss. Star also asks the court to compel the plaintiffs to execute a release for Smith Sr.'s military health records. However, I decline to compel the plaintiffs to execute such release, as Smith Sr. was discharged in approximately 1978,

more than 22 years prior to his death, and Star has advanced no argument as to why such medical records are relevant to the damages calculation, especially when it seeks only medical records dating back five years in Interrogatory No. 4. For this reason, I will deny Star's Motion to Compel as it relates to the release of Smith Sr.'s military health records.

## 2. *Request for Production No. 1*

Request for Production No. 1 states as follows:

> Please produce true, correct and complete copies of all medical records from all healthcare providers who saw, examined, treated or evaluated each of the decedents during the five years preceding the subject accident.

The plaintiffs objected to this request for production as "irrelevant, overly broad, unduly burdensome and not likely to lead to the discovery of admissible evidence under Rule 26." Nonetheless, the plaintiffs went on to state that they were not in possession of such documents and that nothing in the Federal Rules of Civil Procedure requires them to obtain documents not in their possession. The plaintiffs further suggested that Star may seek such documents pursuant to Federal Rule of Civil Procedure 45 by way of subpoenas. As Star notes, the plaintiffs, as administrators of the decedents' estates, sue on behalf of the statutory beneficiaries. In other words, they act as surrogates or trustees of the beneficiaries and, in that capacity, must make reasonable efforts to obtain the information sought. That being said, and for the reasons stated above in connection with Interrogatory No. 4, I will grant Star's Motion to Compel as it relates to Request for Production No. 1. Insofar as the plaintiffs have such documents in their possession, I will order them to produce the documents.

-23-

### 3. Interrogatory No. 10

Interrogatory No. 10 states as follows:

> Please describe the nature and prognosis of any physical, mental and emotional disabilities of the Plaintiffs' claimed beneficiaries since the subject accident and state the dates and reasons for such treatment.

In their answers to interrogatories, the plaintiffs, after objecting to this interrogatory as irrelevant, overly broad, vague, unduly burdensome and not likely to lead to the discovery of admissible evidence under Rule 26, indicated that Brandy Spradling has received counseling from a psychiatrist and/or psychologist for post-traumatic stress syndrome. However, they fail to provide the name of the treating medical provider or the dates of treatment. The plaintiffs further stated that the other beneficiaries have relied upon the support of family and friends. It appears to the court that such interrogatory seeks information that is relevant to the wrongful death action at issue, in that whether the beneficiaries sought treatment for mental or physical ailments goes to show the extent of their mental anguish as a result of the decedents' deaths. That being said, I will grant Star's Motion to Compel insofar as I will order that the name(s) of the treating medical provider(s) and dates of Spradling's treatment be furnished to Star. I further will order that the plaintiffs make reasonable efforts to obtain the information requested as it relates to the other statutory beneficiaries. If, after reasonable efforts, the plaintiffs are unable to obtain such information, the plaintiffs must represent this to the court. If the plaintiffs are unable to obtain the requested information, Star then may have to take the depositions of the beneficiaries, pursuant to Federal Rule of Civil Procedure 30, or depose the beneficiaries by written questions, pursuant to Federal Rule of Civil Procedure 31.

### 4. Interrogatory No. 18

Interrogatory No. 18 states as follows:

> Please identify the residences of each of the decedents and the Plaintiff's claimed beneficiaries through the present date and specify the time periods when each of the referenced individuals resided at each address. Please also identify all other persons who resided at such addresses contemporaneously with the above-identified individuals and specify the time periods when any other individuals resided at each such address.

The plaintiffs responded by providing only addresses for each decedent and each beneficiary, with the exception of Thomas Wearen and Elijah Ellis, whose addresses were listed as unknown. In their opposition brief, the plaintiffs state that they have responded with as much information as is available, and there is nothing more to offer. However, they invite Star to notice the deposition of any beneficiary, pursuant to Rule 30, to seek whatever information it deems lacking. I first note that this interrogatory seeks information that is unlimited in its time frame. For that reason, I find that it is overly broad and would limit it to the 10 years preceding the decedents' deaths. Moreover, as with Request for Production No. 1 and Interrogatory No. 10, the plaintiffs must represent to the court that they have made reasonable efforts to obtain this information, as opposed to merely stating that they have responded with as much information as is available. If the plaintiffs are, indeed, unable to obtain the information after reasonable efforts to do so, Star may then resort to taking the depositions of the beneficiaries, pursuant to Rule 30.

### 5. Request for Production No. 4

Request for Production No. 4 states as follows:

> Please produce true, correct and complete copies of any and all written
> communications between the decedents and the Plaintiffs' claimed
> beneficiaries for five years preceding the subject accident.

The plaintiffs have stated that they are "in the process of obtaining the documents responsive to Defendants' request and will supplement any documents intended as exhibits at the trial of this matter in accordance with the court's Scheduling Order." However, Star contends that this request for production is "not so limited, and the Plaintiffs should be required to produce **any and all** correspondence between the decedents and the beneficiaries, not just the communication that Plaintiffs intend to introduce at trial." In their responses to Star's first request for production of documents, (Exhibit B to Docket Item No. 47), the plaintiffs state that they are not in possession of the requested documents, and in their opposition brief, (Docket item No. 52), they state that should they come into possession of them, they will supplement their responses no later than what is provided for by the court's scheduling order. I find that such information is relevant to determining the relationships between the decedents and their respective beneficiaries and, therefore, is relevant to the determination of the measure of damages for loss of companionship. I agree with Star that the request for production is not limited to documents that the plaintiffs intend to introduce as exhibits at trial and, therefore, the plaintiffs' response is deficient in that regard. The plaintiffs assert that they are not in possession of the requested documents. Again, I find that the plaintiffs, as administrators of the decedents' estates, have a duty to make reasonable efforts to obtain the information sought. For all of these reasons, I will grant Star's Motion to Compel as to Request for Production No. 4, and I will order the plaintiffs to make reasonable efforts to obtain any and all correspondence between the decedents and their beneficiaries for the five years preceding the accident.

-26-

*III.  Conclusion*

For the reasons stated herein, the Plaintiffs' Motion to Compel is denied, and it is ordered that Furgerson's unexecuted May 7, 2010, answers to interrogatories are struck.  Star's Motion to Compel is denied, insofar as it seeks the military health records of Smith Sr.  Star's Motion to Compel is granted in all other respects, consistent with this Memorandum Opinion.

The Clerk shall certify a copy of this Memorandum Opinion to all counsel of record.

**ENTER:**     August 30, 2010.

/s/  *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE